UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


In the matter of:

Michigan Machine Tool
Control Corporation,                                    Case No. 06-47572-MBM
                                                        Chapter 7
_____Debtor.____/                    Hon. Marci B. McIvor
Charles L. Wells, III, Trustee,

            Plaintiff,

vs.                                                     Adv. Pro. No. 07-5709

Gerald C. Sleep, Thomas M. Slusher,
Sandra Slusher and James Skerske,

_____Defendants._____/

## OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' cross-Motions for Summary

Judgment.  Plaintiff/Trustee seeks judgment on Counts I and II of the four-count

Complaint.  Defendants seek dismissal of the Complaint in its entirety.[1]  Relying on the

Trustee's powers under 11 U.S.C. § 544, Count I seeks recovery of alleged fraudulent

transfers under Mich. Comp. Laws §§ 566.34 and 566.35.  Count II seeks recovery of

the transfers as unauthorized distributions to shareholders under Mich. Comp. Laws

§ 450.1345.  Count III seeks to subordinate the Defendants' claims to the claims of all

other creditors pursuant to 11 U.S.C. § 510(c).  Count IV seeks to disallow Defendants'

_____

[1]Defendants Gerald Sleep, James Skerske, and Sandra Slusher filed a joint
Motion for Summary Judgment seeking dismissal of the Complaint in its entirety
(hereinafter referred to as "Defendants' MSJ").  Defendant Thomas Slusher filed a
separate Counter-Motion for Summary Judgment seeking dismissal of the Complaint in
its entirety (hereinafter referred to as "Slusher MSJ").

1

claims pursuant to 11 U.S.C. § 502(d).

On January 22, 2007, the Court heard oral argument on the Motions and issued an Opinion from the bench denying Plaintiff's Motion for Summary Judgment and granting Defendants' Motions for Summary Judgment. This written Opinion is issued to supplement and clarify the Opinion issued from the bench.

## I. Factual Background

Prior to filing bankruptcy, debtor Michigan Machine Tool Control Corporation ("MMT") was engaged in the design, construction, and installation of hydraulic and pneumatic controls for manufacturing automation systems. The company was formed in 1985, when 15 employees of B & G Automation, Inc., realizing that their employer was closing its doors, established the new company to carry on the business.

Michigan Machine Tool was established as a closely held subchapter "S" corporation. [2] At the time MMT was formed, each of the 15 shareholders signed a Buy-Sell Agreement which provided in relevant part:

> If you want to transfer any of your shares of the corporation's stock, you **must** first give the corporation the option to purchase the shares. The corporation's option shall last for sixty days after it receives written notice of the proposed transfer. If the corporation does not exercise its option within sixty days you **may** transfer all or a part of your stock.

---

[2] A corporation may elect to be taxed as a S corporation under subchapter S of the Internal Revenue Code. 26 U.S.C. § 1366. A subchapter S corporation is, a small corporation that has elected, under the Internal Revenue Code ('IRC'), to be taxed similarly to partnerships. When a corporation has elected to be taxed under Subchapter S, the corporation itself is not subject to income tax. Rather, the income tax is imposed directly on the shareholders on a pro rata basis. In other words, the corporation's income 'passes through' to the shareholders, who then report that income on their individual tax returns.
*Friedman v. Commissioner of Internal Revenue*, 216 F.3d 537, 539 (6th Cir. 2000)(*citing* 26 U.S.C. § 1366).

. . .

If you die, become disabled, or terminate your employment, within sixty days of such event the corporation **shall** purchase all of your stock. . .

The purchase price for the stock shall be book value per share at the end of the last calendar quarter preceding the date of purchase. Book value shall be calculated by the accountant regularly employed by the corporation in accordance with accounting principles normally used in preparing the financial statements of the corporation, and this determination shall be binding and conclusive upon all persons involved.

The purchase price may, at the option of the corporation, be paid in a single lump sum or in five equal annual installments. If the payment is to be made in a lump sum, it shall be made at the time of the delivery of the endorsed stock certificates to the corporation. If the corporation elects to pay the purchase price in installments, the first installment shall be made at the time of the delivery of the endorsed stock certificates to the corporation and the remaining installments shall be evidenced by promissory notes bearing interest at an annual interest rate equal to the "Prime Rate" of interest as established by National Bank of Detroit as of the date the corporation exercises its option.

(Plaintiff's Ex. 2, emphasis added).

Defendants Gerald Sleep, Thomas Slusher, and James Skerske were three of

MMT's original shareholders, and each signed a Buy-Sell Agreement on January 16,

1985. (Affidavit of MMT's corporate secretary Donald Stacey, hereinafter "Stacey Aff." at

5-6); Plaintiff's Ex. 2).[3] In addition to being a shareholder, Thomas Slusher was on the

Board of Directors from 1997 (Plaintiff's Ex. 1, Minutes from MMT Annual Meeting of

Shareholders dated May, 1997) through some time in early 2001 (Plaintiff's Ex. 3,

Minutes from MMT Board meeting dated May 16, 2001).[4] James Skerske was an

---

[3]Defendant Sandra Slusher is the ex-wife of Defendant Thomas Slusher. She was not a shareholder of Michigan Machine Tool. Ms. Slusher holds notes payable by Michigan Machine Tool as a result of her divorce from Mr. Slusher.

[4]The minutes from that meeting state that "[t]he annual meeting was rescheduled for July 24, 2001. At that time we will fill the vacancy on the Board left by the departure

officer of the corporation until 1998. (Defendant Skerske's Answer to Complaint, ¶ 9; Plaintiff's MSJ at 5).

In late 1997 or early 1998, for reasons that are not clear from the record, Sleep, Skerske, and T. Slusher decided to sell their stock.[5] On March 3, 1998, MMT redeemed the shares owned by Sleep, Skerske, and Thomas Slusher, pursuant to the Buy-Sell Agreements. (Defendants' MSJ Ex. F; Slusher MSJ Ex. 7).[6] As set forth in the Buy-Sell Agreements, MMT agreed to pay for the shares in five equal annual installments, the first installment payable at the time the endorsed stock certificates were delivered to the company, and the other installments payable pursuant to interest bearing promissory

---

of Tom Slusher." Thomas Slusher's exact departure date is not mentioned.

There is confusion regarding Mr. Slusher's role in MMT between 1997 and 2001. According to the Minutes of the shareholders' meeting held May 21, 1997, "Thomas M. Slusher announced that he would be retiring at the end of the year." (Plaintiff's Ex. 1). Presumably this meant at the end of 1997. However, he was re-elected to the Board the following year. (Plaintiff's Ex. 3, Minutes of Annual Shareholder Meeting held May 28, 1998, *but see* Slusher's Ex. 4, Minutes of Annual Board of Directors' meeting, with hand-written changes crossing out Slusher's names as a board member, and writing in two other candidates). It appears that Slusher remained on the Board through sometime in late 2000 or early 2001, because his absence from many Board meetings was specifically noted in the meeting Minutes. (Plaintiff's Ex. 3, Minutes from various board meetings). It does not appears that he was an "employee" after 1997.

[5]Sleep and Skerske's reasons for selling their stock are not disclosed in the record, but the Buy-Sell Agreement gives MMT the right of first refusal in repurchasing any shares that shareholders want to sell (i.e. "If you **want** to transfer any of your shares of the corporation's stock, you must first give the corporation the option to purchase the shares"). Sleep and Skerske were not retiring, and continued their employment with Defendant until they were laid off in 2000 and 2001. T. Slusher's decision to sell was presumably motivated by his desire to retire.

[6]While a copy of the Board's written approval for the repurchase of Mr. Skerske's stock is not in the record, the Court assumes, and the parties do not dispute, that it was approved at the same Board meeting and pursuant to the same terms as the repurchase of the other Defendants' stock.

4

notes. (Defendants' Ex. D; Slusher Ex. 2).[7]  The specific redemption terms for each

defendant are as follows:

> On March 1, 1998, Debtor redeemed all of Gerald Sleep's 27,796 shares of common stock for $431,569.00.  On March 13, 1998, he received a cash payment of $86,313.80 plus interest of $6,090.44.  Debtor issued four promissory notes for the remaining balance.  The notes were dated March 1, 1998, each in the amount of $86,313.80 plus interest at a rate of 8.5%.  The first note was due on March 1, 1999.  The other notes were due on March 1, 2000, March 1, 2001, and March 1, 2002.

> On March 1, 1998, Debtor redeemed all of James Skerske's 64,010 shares of common stock for $993,838.00.  On March 13, 1998, he received a cash payment of $198,767.60 plus interest of $14,025.37.  Debtor issued four promissory notes for the remaining balance.  The notes were dated March 1, 1998, each in the amount of $198,767.60 plus interest at a rate of 8.5%.  The first note was due on March 1, 1999.  The other notes were due on March 1, 2000, March 1, 2001, and March 1, 2002.

> On March 1, 1998, Debtor redeemed all of Thomas Slusher's 91,178 shares of common stock for $1,425,657.  On March 13, 1998, he received a cash payment of $471,885.67 plus interest of $20,549.65.  Debtor issued four promissory notes for the remaining balance.  The notes were dated March 1, 1998, each in the amount of $235,942.83 plus interest at a rate of 8.5%.  The first note was due on March 1, 1999.  The other notes were due on March 1, 2000, March 1, 2001, and March 1, 2002.  On August 22, 2003, Thomas and Sandra Slusher were divorced.  Pursuant to the Judgment of Divorce, Debtor cancelled the original notes and reissued notes to Thomas Slusher and S. Slusher separately.

Plaintiff's MSJ at 4-5; Defendants' MSJ at 2; Slusher's MSJ at 2).  The amount paid by

Debtor for Defendants' stock was determined by the book value of the stock as reflected

on Debtor's financial statements for the quarter ending December 31, 1997, in

---

[7]Defendants' Ex. D is a copy of a promissory note payable to Gerald Sleep maturing March 1, 2002.  Slusher's Ex. 2 includes copies of three notes payable to T. Slusher, maturing March 1, 2000, 2001 and 2002.  While copies of every note issued to each Defendant are not included in the record, the Court assumes, and the parties do not dispute, that all of the notes issued to Defendants by Debtor were identical, but for the number of shares purchased and the total dollars owed to each Defendant.  The repayment terms on the notes are not in dispute.

accordance with the terms of the Buy-Sell agreement. (Plaintiff's Ex. 4, MMT Financial Statement for year ending December 31, 1998, footnote E; Slusher MSJ, Ex. 4, Deposition of Debtor's accountant Robert Bublitz, at 22).

The Minutes from MMT's Board of Directors' meetings held around the time the stock repurchase decision was made do not include extensive discussion regarding the effects of the repurchase on the company's financial condition. (Plaintiff's Ex. 3). However, MMT's financial statement for the fiscal year ending December 31, 1997 discloses that the company was solvent (total assets of $7,087,465 and total liabilities of $973,834) with $3,564,704 in cash and net income of $1,487,660 on sales of $9,291,600. (Plaintiff's Ex. 4, Financial Statement for year ended 1998, with comparative statement for year ended 1997).[8]  According to the company's accountant, the repurchase of shares in March, 1998 was made in accordance with the Buy-Sell Agreements and  did not render the corporation insolvent at that time (Bublitz Dep., Slusher MSJ, Ex. 5 at 25-26).  Debtor  retained adequate capital to operate and continued to pay its debts in a timely manner.  (Slusher MSJ, Ex. 5 at 25-26; Ex. 1, Stacey Dep.at 54).   This statement is confirmed by the Financial Statement for 1998. (Plaintiff's Ex. 4).  The Financial Statement for year ending 1998 shows total assets of $5,563,571 and total liabilities of $2,695,837. The Board approved a discretionary stock dividend of $1.00 per share to all shareholders payable December 10, 1998, approximately 9 months after approval of the stock repurchase. (Plaintiff's Ex. 3, Board

_____

[8]The financial statement for the year ending December 31, 1998 shows total assets of $5,563,571 and total liabilities of $2,695,837.  The Court notes no financial statements were provided for fiscal years 1999 or 2000.  By December 31, 2001, Debtor was no longer solvent, with total assets of $340,242 and total liabilities of $3,173,781.

6

Minutes dated December 9, 1998).[9]

Debtor paid the principal and interest owed pursuant to the promissory notes maturing on March 1, 1999.  By the time payments became due on the notes maturing March 1, 2000 Debtor's Board of Directors determined that the company's financial condition allowed for monthly interest payments only.  "The Board decided to make monthly installment payments of the money owed the three participants, with the first payment due March 1, 2000, and with a payment due each succeeding month for the next eleven months with interest added."  (Plaintiff's Ex. 3, Minutes of Board of Directors' Meeting, February 28, 2000).[10]  The matter was discussed again at a Board meeting in August, 2000.  It was again determined that due to "lack of finances at present, the corporation is unable to make shareholder redemption payments" to Defendants.  (Plaintiff's Ex. 3, 6, 7).  Interest only payments on the notes continued through February, 2005.  It is the interest-only payments made to Defendants between January 10, 2002 and February 7, 2005 which the Trustee seeks to recover in the present action.[11]

---

[9] Because Defendants were not shareholders at that time, they did not receive that dividend.

[10] The Board of Directors consisted of Joseph Glowacki, Granville Slusher, Donald Stacey, Bruce McEnroe and Thomas Slusher.  (*See* June 29, 1999 Minutes unanimously nominating the Board of Directors).  With the exception of Thomas Slusher, all of the Board members were also shareholders.  The Minutes from the February 28, 2000  meeting indicate that all of the directors, with the exception of Joseph Glowacki, were present at the meeting.  Mr. Glowacki was contacted by telephone and agreed with the Board's decision regarding the interest only payments. The Minutes also indicate that the Board discussed and rejected the possibility of making no payments (principal or interest) on the notes.

[11] The Trustee seeks to recover $400,713.77 of interest paid from January 10, 2002 through February 7, 2005:  $66,891.01 paid to Gerald Sleep, $142,967.25 paid to

During the last several months of 1998, Debtor was negotiating a purchase agreement to acquire the assets of its largest customer, Inter-Lakes Steel Products, Co., and a related entity, Inter-Lakes Design, Inc. On November 2, 1998, MMT announced the acquisition and issued the following statement:

> This purchase means a lot for our Company's future; we can now better procure, control and direct the flow of work from first tier customers. **Without this acquisition, our Company's future was bleak**; we were being forced into a position of a time and material house working for less profit than we've known in the past. Our competition was and is the integrated design/build houses where engineering, controls and mechanical are under one roof. With our new structure, we will maintain direct relationships with primary customers enabling us to quote and win larger, more sophisticated automation system contracts which would otherwise go to our competition.

(Plaintiff's Ex. 3, Announcement- Shareholder Group and Employees [on] Acquisition of Inter-Lakes Steel Products, November 2, 1998, emphasis added; *see also* Plaintiff's Ex. 4, MMT's financial statement dated December 31,1998, note 1, discussing the terms of the acquisition). The acquisition was financed through a cash infusion of $1,080,000 from MMT and financing from Comerica Bank. (Plaintiff's Ex. 4, note 1). The effective date of the acquisition was January 1, 1999.

Debtor's sales declined after the acquisition of Inter-Lakes Steel, and Debtor's working capital and cash were depleted. It is difficult to determine exactly how much and/or how quickly Debtor's financial condition deteriorated because the record does not include financial statements for fiscal years 1999 and 2000. At MMT's February 28, 2000 Board meeting, the Board acknowledged that its financial condition had

---

Thomas Slusher, $154,039.84 paid to James Skerske, and $36,815.67 paid to Sandra Slusher. The payments to Sandra Slusher were made between November 5, 2003 and February 7, 2005.

deteriorated to the point that it could not pay the principal due on Defendants' March 1, 2000 promissory notes. According to the Board Minutes from that meeting, Robert Bublitz, Plaintiff's accountant, told the Board that Inter-Lakes was not profitable, Debtor's "cash reserve was approaching a critical level", and Comerica Bank had asked Debtor to delay payment on the notes for one year. (Plaintiff's Ex. 3). The April, 2000 Board Minutes indicate that "Inter-Lakes Steel was at its maximum credit limit with Comerica Bank and that Michigan Machine Tools cash reserves were exhausted." (Plaintiff's Ex. 3).

Eventually, Comerica declared Debtor and Inter-Lakes in default under the loans. The exact date of the default is not clear. However, the record includes a Forbearance Agreement between Comerica Bank, Inter-Lakes Steel Products Co., LLC (borrower), and MMT (guarantor) dated January 23, 2001 (Plaintiff's Ex. 5). That Agreement references a prior Forbearance Agreement dated April 18, 2000 and several amendments. The Forbearance Agreement restricted Debtor's ability to manage its cash, and increased the interest rate on the debt.

On January 23, 2001, Debtor MMT, Inter-Lakes Steel, and Greenfield Commercial Credit, LLC entered into a Factoring and Security Agreement, pursuant to which Debtor granted a security interest in all its assets. (Plaintiff's Ex. 9). At the January 23, 2001 closing, approximately $1,269,376 of receivables belonging to Debtor and its subsidiaries were factored to payoff the Comerica Debt. (Plaintiff's Ex. 9).

On April 3, 2002, Inter-Lakes Steel entered into a Trust Mortgage providing for the liquidation of all of its assets for the benefit of its creditors. (Plaintiff's Ex. 10). At that time, Inter-Lakes Steel Products Co., LLC owed Debtor $3,743,311.65 in

9

receivables that were never paid.

Notwithstanding the demise of its subsidiary Inter-Lakes Steel, MMT continued to operate. Between 2000 and 2005, it borrowed additional money (approximately $990,700) from ten of its remaining shareholders, by issuing promissory notes. (Plaintiff's Ex. 8, 11-13). At least four of the shareholders loaning money were also on the Board of Directors. Debtor was unable to make payments due under those notes.

MMT ceased operating in February, 2006 (Slusher MSJ, Ex. 5, Bublitz Dep. at 29) and filed a voluntary chapter 7 bankruptcy petition on June 13, 2006. Ten of Debtor's shareholders filed claims in the MMT bankruptcy. The ten shareholder claims, along with the claims filed by the four Defendants, total $3,168,099.25 or 93% of the total claims ($3,417,981.29) filed in the MMT bankruptcy.[12]

The Trustee filed the present adversary Complaint on May 15, 2007. The Trustee contends that the interest payments made to Defendants between January 10, 2002 and February 7 2005 were fraudulent transfers and/or improper shareholder distributions under Michigan law.

## II. Jurisdiction

Bankruptcy courts have jurisdiction over all cases under title 11 and all core proceedings arising under title 11 or arising in a case under title 11. *See* 28 U.S.C. §§ 1334 and 157. Core proceedings include proceedings to determine, avoid, or recover fraudulent conveyances and preferences (11 U.S.C. § 157(b)(2)(F) and (H)).

---

[12]The ten shareholder/claimants are Granville Slusher, Terry Sleep, Joseph Glowacki, Jeffrey Slusher, Jack Harrison, Donald Stacey, Lloyd Grant, Michael McLaughlin, Kevin Raymond, and Bruce McEnroe. Granville Slusher, Joseph Glowacki, Donald Stacey, and Bruce McEnroe were also on the Board of Directors.

10

### III.  Standard for Summary Judgment

Fed. R. Civ. P. 56(c) for summary judgment is incorporated into Fed. R. Bankr. P. 7056(c).  Summary judgment is only appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. 317, 323.  A "genuine" issue is one where no reasonable fact finder could return a judgment in favor of the non-moving party.  *Berryman v. Reiger*, 150 F.3d 561, 566 (6th Cir. 1998) (citing *Anderson*, 447 U.S. at 248).  Once the movant meets this burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts.  If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the non-moving party, the motion should be granted."  *Cox v. Kentucky Dept. of Transportation*, 53 F.3d 146, 149-50 (6th Cir. 1995) (internal quotation marks and citation omitted).

There are no material questions of fact in this case.  The legal issue is whether Debtor's payment of interest on contractual obligations owed to Defendants are

11

avoidable either as fraudulent transfers or as unlawful shareholder distributions.

## IV. Analysis

A. Count I: Fraudulent Transfers Under Mich. Comp. Laws §§ 566.34 and 566.35

The Uniform Fraudulent Transfers Act "was designed to protect unsecured creditors against debtors who make transfers out of, or make obligations against, the debtor's estate in a manner adverse to the creditors' rights." *Multi-Grinding, Inc. v. Richardson Sales & Consulting Services, Inc.*, 2004 WL 1335813 (Mich. App.) at *2, *citing Nicholas Loan & Mortgage, Inc. v. W. Va. Coal Co-Op, Inc.*, 209 W.Va. 296 (2001, discussing the *Uniform Fraudulent Transfers Act*, § 3, comment 2 . Michigan adopted the Uniform Fraudulent Transfers Act in 1998. Mich. Comp. Laws 566.31 *et. seq.* (hereinafter referred to as "the Act").[13] Using the Trustee's powers under 11 U.S.C. § 544(a)[14], Count I of the Trustee's Complaint asserts claims under MCL §§ 566.34 (1)(a) and (b), and 566.35(1) of the Act. (Plaintiff's Complaint ¶ 22).

1. Elements of a Cause of Action under MCL § 566.34

Section 566.34(1) of the Act provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was

---

[13]As noted by the court in *In re Harlin*, 321 B.R. 836 (E.D. Mich. 2005), the adoption of the Uniform Fraudulent Transfer Act did not fundamentally alter the nature of fraudulent transfers (or, more specifically in that case, constructive fraudulent transfers) from the prior Uniform Fraudulent Conveyance Act. Thus, Michigan case law interpreting the prior act is still viable. *Id.* at 839. *See also Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528, 532 (6th Cir. 2003).

[14]11 U.S.C. § 544 allows the trustee to step into the shoes of a creditor in order to nullify transfers voidable under state fraudulent conveyance acts for the benefit of all creditors. *Corzin v. Fordu* (*In re Fordu*), 201 F.3d 693, 697 n. 3 (6th Cir.1999) (quotation omitted); *see also Mason v. Young* (*In re Young*), 238 B.R. 112, 114 (6th Cir.BAP 1999).

12

made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following:

> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor did either of the following:

>> (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

>> (ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

While the Trustee's Complaint specifically references actual fraud under § 566.34(1)(a), the Complaint does not plead, nor does the record support, a cause of action for actual fraud. With respect to MCL 544.34(1)(b), commonly described as "constructive fraud," the Trustee must show that Debtor received less than reasonably equivalent value in exchange for the transfer made to Defendants **and** that Debtor either: (1) was about to engage in a business transaction for which Debtor had insufficient assets in relation to the transaction, or (2) Debtor intended to incur or reasonably should have believed that he would incur debts beyond his ability to pay.

The Trustee argues that each monthly interest payment made to Defendants by Debtor constituted a separate transfer for which equivalent value had to be given to Debtor by Defendants. Defendants contend that only one transfer took place–the March, 1998 transfer of cash and promissory notes in exchange for stock.

13

"Transfer" is defined under Michigan law as,

> every mode, direct or indirect, absolute or conditional, voluntary or involuntary, **of disposing of or parting with an asset** or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or encumbrance."

MCL § 566.31(l)(emphasis added).  Under the Bankruptcy Code, "transfer" means:

(A) the creation of a lien;

(B) the retention of title as a security interest;

(C) the foreclosure of a debtor's equity of redemption; or

(D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, **of disposing of or parting with**

> (i) **property**; or

> (ii) an interest in property

11 U.S.C. § 101(54)(emphasis added).  Under either definition of "transfer", the only "transfer" in the case at bar occurred in March, 1998.  Debtor disposed of an asset when it entered into binding contracts to redeem Defendants' stock.  The obligations were fixed at the time Debtor signed the promissory notes incorporating the terms of the Buy-Sell Agreements. All of the payments made to Defendants between 1998 and 2005 were controlled by the terms of the notes (and any mutually agreed to subsequent modifications) issued by Debtor in March, 1998.  Because the monthly payments made by Debtor to Defendants were made pursuant to valid and binding contracts entered into in 1998, the payments are not separate "transfers" as defined by Michigan law or the Bankruptcy Code.

Under the Trustee's definition of transfer, once a debtor becomes insolvent, every subsequent payment a debtor makes on a contractual obligation incurred prior to

14

the Debtor's insolvency is a fraudulent transfer. Neither the Bankruptcy Code nor Michigan law prevent a debtor from paying contractual obligations, even where the continued payment of those obligations contributes to a debtor's insolvency.

Because the relevant transfer took place in March, 1998, the Trustee's cause of action is time-barred by MCL § 600.5813,[15] which provides a 6 year statute of limitations which runs from the time a claim accrues. A claim accrues at the time the wrong upon which the claim is based occurs, regardless of when the damage results. MCL § 600.5827.[16]

Even if the Trustee's action were not time barred, Debtor received reasonably equivalent value for the promissory notes. Because the bargain was struck and the obligations were incurred in March, 1998, the issue of whether Debtor received "reasonably equivalent value" in exchange for the obligations must be analyzed as of the date of the transaction. Michigan's Fraudulent Transfer Act does not define the term "reasonably equivalent value." As explained by the Michigan Court of Appeals:

> The phrase 'reasonably equivalent value' was derived from the federal Bankruptcy Code. 11 U.S.C. § 548. . . . The UFTA has been construed to require that the value given in exchange for the transaction be received by and benefit the debtor-transferor, and not some third party or entity. . . . But indirect benefits to the debtor-transferor may be considered, even if

---

[15]MCL § 600.5813 states:
All other personal actions shall be commenced within the period of 6 years after the claims accrue and not afterwards unless a different period is stated in the statutes.

[16]MCL § 600.5827 states:
Except as otherwise expressly provided, the period of limitations runs from the time the claim accrues. The claim accrues at the time provided in sections 5829 to 5838 and in cases not covered by these sections the claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results.

the net worth of the debtor-transferor is not affected.

. . .

Ultimately, a court should consider all the facts and circumstances in making the 'reasonably equivalent value' determination, keeping in mind that any significant disparity between the value received and obligation assumed by the debtor-transferor will significantly harm innocent creditors."

*Multi-Grinding, Inc. v. Richardson Sales & Consulting Services, Inc.*, 2004 WL 1335813 at *4 (Mich.App.)(citations omitted).

In the present case, the value of the stock given to Debtor in exchange for the notes was pre-determined in the Buy-Sell Agreements. Pursuant to those Agreements, Debtor was bound to redeem the stock at "book value per share at the end of the last calendar quarter preceding the date of the purchase." The Buy-Sell Agreements were very specific:

Book value shall be calculated by the accountant regularly employed by the corporation in accordance with accounting principles normally used in preparing the financial statements of the corporation, and **this determination shall be binding and conclusive upon all persons involved.**

(Plaintiff's Ex. 2, emphasis added). In his deposition testimony, Robert Bublitz, Debtor's accountant, testified that the terms of the redemption agreements were in substantial compliance with the terms of the Buy-Sell Agreements. Debtor's Board of Directors approved the transactions.

In his Motion for Summary Judgment, the Trustee argues that "[D]efendants gave nothing to the Debtor in exchange for the Transfers other than their stock certificates, which became treasury shares. As a matter of corporate law and corporate finance, treasury shares are not assets of the company and have no value." (Plaintiff's MSJ at 17). Having reviewed the cases cited by the Trustee, the Court agrees this may be true

16

as a matter of accounting principles or general corporation law.  However, shares of a corporation's own stock may be deemed "reasonably equivalent value" for purposes of fraudulent conveyance law, where the consideration is fair.  *Webster v. Barbara (In re Otis & Edward, P.C.)*, 115 B.R. 900, 909 (Bankr. E.D. Mich. 1990).  In the instant case, the consideration paid to Defendants was dictated by the terms of the Buy-Sell Agreements which were entered into in 1985.  There is nothing in the record to support an argument that the consideration paid for the stock was unfair.  The amount paid was the amount required by the Buy-Sell Agreement, and Debtor was solvent at that time.

Because the Trustee cannot show that at the time of the transfer, Debtor received less than reasonably equivalent value for the redeemed stock, there are no genuine issues of material fact on Plaintiff's fraudulent transfer claim under MCL § 566.34, and that portion of Count I is dismissed.

    2.  Elements of a Cause of Action under MCL § 566.35

MCL § 566.35(1) states:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

This section requires evidence that the debtor made a transfer without receiving a reasonably equivalent value in exchange for it, *and* that he was insolvent at the time, or rendered insolvent as a result of it.

Plaintiff's claim under MCL § 566.35(1) is time-barred for the reasons explained above.  Even if the claim were not time barred, Debtor received reasonably equivalent

value in exchange for the promissory notes, and Debtor was not insolvent or rendered insolvent as a result of issuing the notes in 1998. Furthermore, a transfer can only violate § 566.35(1) if the transfer harms pre-existing creditors. There is nothing in the record to show that the redemption of Defendants' stock under the terms of the Buy-Sell Agreement had any negative impact on creditors existing at the time of the redemption.

Because there are no genuine issues of material fact regarding Plaintiff's claim under MCL § 566.35, Count I of the Complaint is dismissed.

B. <u>Count II: Unauthorized Distribution to Shareholders under MCL § 450.1345(3) and MCL § 450.1551(3)</u>

In Count II of the Complaint, the Trustee asserts that the payments made to Defendants under the promissory notes were "distributions" as defined by MCL § 450.1106(4) and that they constitute unauthorized distributions to shareholders in violation of MCL §§ 450.1345(3) and 450.1551(3).[17]

According to MCL § 450.1106(4),

> 'distribution' means a direct or indirect transfer of money or other property, except the corporation's shares, or the incurrence of indebtedness by the corporation to or for the benefit of its shareholders in respect to the corporation's shares. A distribution may be in the form of a dividend, a purchase, **redemption or other acquisition of shares**, an issuance of indebtedness, or any other declaration or payment to or for the benefit of the shareholders.

(Emphasis added). MCL § 450.1345 states in relevant part:

---

[17]MCL § 450.1551(3) states:
A shareholder who accepts or receives a share dividend or distribution with knowledge of facts indicating that it is contrary to this act, or any restriction in the articles of incorporation, is liable to the corporation for the amount accepted or received in excess of the shareholders' share of the amount that lawfully could have been distributed.

(1) A board may authorize and the corporation may make distributions to its shareholders subject to restriction by the articles of incorporation and the limitation in subsection (3).

(2) If the board does not fix the record date for determining shareholders entitled to a distribution, other than a distribution involving a purchase, redemption, or acquisition of the corporation's shares, the record date is the date the board authorizes the distribution.

(3) A distribution shall not be made if, after giving it effect, the corporation would not be able to pay its debts as the debts become due in the usual course of business, or the corporation's total assets would be less than the sum of its total liabilities plus, unless the articles of incorporation permit otherwise, the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

(4) The Board may base a determination that a distribution is not prohibited under subsection (3) on financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances, on a fair valuation, or on another method that is reasonable.

(5) The effect of a distribution under subsection (3) is measured at the following times:

(a) Except as provided in subsection (7)**, in the case of a distribution by purchase, redemption, or other acquisition of the corporation's shares**, as of the earlier of the date money or other property is transferred or debt incurred by the corporation, or **the date the shareholder ceases to be a shareholder with respect to the acquired shares.**

(b) In the case of any other distribution of indebtedness, as of the date the indebtedness is authorized if distribution occurs

19

within 120 days after the date of authorization or the date the indebtedness is distributed if it occurs more than 120 days after the date of authorization.

(c) **In all other cases**, as of the date the distribution is authorized if the payment occurs within 120 days after the date of authorization or the date the payment is made if it occurs more than 120 days after the date of authorization.

In the instant case, the Trustee argues that the interest payments made by Debtor to Defendants between 2002 and 2005 were made to the detriment of creditors. The Trustee argues that each separate payment made pursuant to the promissory note was a separate distribution and that those distributions may be avoided by the Trustee under MCL § 450.1345(5)(c). In order to determine whether the Trustee's reading of the statute is correct, the Court must answer several questions: (1) what is the nature of the distributions made by the Debtor to Defendants? (2) when did the distribution become effective?, and (3) on the effective date of the distribution, was the Debtor rendered insolvent?

The answer to the first question is straightforward. MCL § 450.1106(4) defines distribution very broadly, and specifically includes stock redemptions. In this case, the parties agree that the transactions which took place in 1998 were stock redemptions. Defendants sold all of their shares to the Debtor corporation in exchange for cash and a promissory notes.

The second question is: when did the distribution take effect for purposes of determining whether a distribution violates the Business Corporation Act? The effective date of a distribution is determined by reference to MCL § 450.1345(5). Under

20

§ 450.1345(5)(a), if the distribution is by way of a stock redemption, the effective date of the distribution is "as of the earlier of the date money or other property is transferred or debt incurred by the corporation or the date the shareholder ceases to be a shareholder with respect to the acquired shares."  In this case, the Defendants ceased to be shareholders in March, 1998, when they turned all of their stock certificates over to Debtor.  Thus, the effective date of the distribution is March, 1998.

Under MCL § 450.1345(3), a corporation is prohibited from making a distribution if, on the effective date of the distribution, the distribution causes the debtor to become insolvent.  To answer the third question, regarding the effect of the distributions on the corporation, the Court must look at Debtor's financial condition at the time of the distribution, March 1998.   The financial statements for fiscal years ending December 31, 1997 and 1998 show that Debtor was solvent, both before and after the distributions.  Therefore, the March, 1998 stock redemption did not violate MCL § 450.1345(3).[18]

Because the monthly interest payments to Defendants were made more than 120 days after the distribution was authorized, the Trustee relies on MCL § 450.1345(5)(c), rather than (5)(a) to argue that the effective date of the distribution to Defendants is the date each monthly payment was made.  However, MCL § 450.1345(5)(c) only controls the date of distribution if the distribution is in a form other

_____

[18] Because the distribution was not prohibited under MCL § 450.1345(3), MCL § 450.1345(7), which is referenced in MCL § 450.1345(5)(a)) does not become applicable.  Subsection (7), states in part "If the corporation acquires its shares in exchange for an obligation to make future payments, and distribution of the obligation would otherwise be prohibited under subsection (3) at the time it is made. . . "  In the present case, the distribution did not violate subsection (3) at the time it was made, thus subsection (7) does not apply.]

21

than the transactions described in MCL § 450.1345(5)(a) and (b). The distribution in this case was a stock redemption agreement, which is expressly included in (5)(a). Thus, MCL § 450.1345(5)(a) is the controlling section of the statute and the effective date of distributions is March, 1998, a date when the Debtor was still solvent. When MCL § 450.1345(3) is read in conjunction with MCL § 450.1345(5)(a,) it is clear that the stock redemption in exchange for cash and notes did not violate the Act.

The Business Corporation Act, specifically MCL § 450.1345 is not a model of clarity, and the few cases which discuss distributions to shareholders in the context of the Act, are not on point with the case at bar. In *Pittsburgh Tube Co. v. Tri-Bend, Inc.,* 185 Mich. App. 581 (Mich. Ct. App. 1990), the court flatly refused to consider a transaction in which a purchaser bought a business (Tri-Bend) from former shareholders by executing a promissory note and security agreement, a "distribution" which violated the Michigan Business Corporation Act. The court stated:

> Plaintiff's characterization of the transaction as an illegal
> dividend distribution is without merit. When the transaction
> was completed, third-party plaintiffs [the former
> shareholders] no longer held stock in the corporation and the
> corporation, through a promissory note personally
> guaranteed by the new shareholders, stood indebted to
> them. The transaction was nothing more and nothing less
> than a purchase and sale of Tri-Bend's stock.

*Pittsburgh* Tube, 185 Mich. App. at 589. *Pittsburgh Tube* was decided in the context of analyzing the enforceability of the former shareholders secured note and did not squarely deal with the issue of whether a stream of payments made pursuant to a note could be considered an unlawful distribution under the Business Corporation Act.

A more recent case, *Frank v. Zaret (In re Peet Packing),* 231 B.R. 42 (Bank. E.D.

22

Mich 1999) is similarly unhelpful. In *Peet Packing*, defendants in an adversary proceeding brought by the trustee under the Uniform Fraudulent Conveyance Act attempted to assert the distribution section of the Michigan Business Corporation Act as a defense to the trustee's action. After a lengthy discussion of the relationship between the Business Corporation Act and the Uniform Fraudulent Conveyance Act, the court found that the defendant had never been a shareholder of the debtor, and therefore, the payments sought by the trustee were not distributions for purposes of the Business Corporation Act. The court held that since the payments from the debtor to the defendant were not distributions under the Business Corporation Act, plaintiff trustee's claim under the Uniform Fraudulent Conveyance Act could go forward.

Superficially both of these cases support Defendants' argument that they cannot be held liable to the estate for payments made to them several years after they sold their entire interest in Debtor. However, neither of the cases provide guidance on the issue of whether payments made over time to pay off a stock redemption should be considered separate distributions for purposes of MCL § 450.1345.

This Court finds that the effective date of distribution is the date on which a shareholder redeems all of his/her stock. If the corporation is solvent at the time of the distribution, there is no violation of MCL § 450.1345. The Court's interpretation of the statute is consistent with the goal of the statute. *See Peet Packing,* 231 B.R. at 45- 46 ("Both the BCA [Business Corporations Act] and the UFCA [Uniform Fraudulent Conveyances Act]. . . address the problem of payments made to the detriment of a corporation's creditors"). The goal of the statute is to prevent a corporation teetering on the edge of insolvency from preferring shareholders over creditors. In 1998, Debtor in

23

the present case was solvent.  The Board (made up of shareholders) believed that the

acquisition of Inter-Lakes Steel would improve Debtor's profitability and  help ensure the

company's future solvency.  The Board also believed that the company could afford to

repurchase Defendants' stock.  The fact that the Board approved the redemption of a

significant amount of stock nine months before the acquisition does not give rise to the

inference that Debtor was attempting to avoid payment to creditors in favor of paying

then-existing shareholders.  Within two years of the acquisition, it became clear that the

Inter-Lakes acquisition may have been an expensive mistake.  A poor business decision

by Debtor does not render the stock redemption either a fraudulent conveyance or a

prohibited distribution under the Business Corporation Act.[19]

  There is no genuine issue of material fact regarding whether the payments to

Defendants were prohibited by the Business Corporation Act. The redemption of

Defendants' stock was a distribution as defined by the Act.  Payments on the notes

---

[19]The Trustee's Motion for Summary Judgment makes much of the fact that Defendants
are related to members of the Board responsible for decisions regarding when and how
payments on the Defendants' promissory notes would be made.   The implication is that
the Board favored payments to Defendants over payments to other creditors, and that
payments to Defendants were made to the detriment of other creditors and the
corporation.  The Court notes that the creditors in this case **are** the Board members and
shareholders of Debtor, most of whom loaned significant sums of money to Debtor.  The
claims of Board members and shareholders (including the Defendants who remain
unpaid on the balance of the notes) constitute 93% of the total claims in MMT's
bankruptcy case. The parties who stood to be most significantly harmed by Debtor's
decision to continue payments to Defendants were Debtor's Board members and
shareholders.  Every time a payment was made to Defendants, Debtor had fewer funds
available to repay the loans made by the non-defendant shareholders and Board
members.  In this case, many of the creditors who the Trustee alleges were defrauded
by continued payments on the notes are the **same** parties who **authorized** the
continued payments on the notes.  Of the $3,417,981 of claims filed in MMT's
bankruptcy, only $249,882 is owed to outside (i.e. non shareholder/Board
member/Defendant) creditors.

24

issued by Debtor are not prohibited distributions under the Act. Because Defendants

did not receive prohibited distributions under the Act, Defendants did not violate MCL

§ 450.1551(3), and are not liable to Debtor's estate for the payments they received.

Defendants are entitled to summary judgment on Count II of Plaintiff's complaint. Count

II is dismissed.

C. Count III: Equitable Subordination of Defendants' Claims

11 U.S.C. § 510(c) of the Bankruptcy Code provides:

Notwithstanding subsection (a) and (b) of this section, after notice and a
hearing, the court may –

(1) under principles of equitable subordination, subordinate
for purposes of distribution all or part of an allowed claim to
all or part of another allowed claim or all or part of an
allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be
transferred to the estate.

"Congress did not identify what the 'principles of subordination' might be because it

intended that the courts would be allowed to continue to develop the doctrine. *See

United States v. Noland*, 517 U.S. 535, 539(1996). It is clear, however, that equitable

subordination must be 'justified by particular facts,' *Id.*, 517 U.S. at 540, so that the

determination must be made on a case by case basis." *Freeland v. I.R.S. (In re White

Trailer Corp.)*, 266 B.R. 390, 393 (Bankr. N.D. Ind. 2000).

The legal standard for establishing equitable subordination was set forth by the

U.S. Supreme Court in *U.S. v. Noland*, 517 U.S. 535 (1996). There are three conditions

which must be shown by a preponderance of the evidence to justify the application of

equitable subordination:

25

(1) The claimant must have engaged in some type of inequitable conduct;

(2) The misconduct must have resulted in injury to the creditors of the bankrupt, or conferred an unfair advantage on the claimant; and

(3) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

*Id.* at 538 (*citing Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir. 1977). *See also First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Financial Services, Inc.)*, 974 F.2d 712, 717-718 (6th Cir. 1992).

As explained by the Sixth Circuit,

The legal standard in applying this test varies depending on whether the creditor is an insider or a non-insider. . . The primary distinctions between subordinating the claims of insiders versus those of non-insiders lie in the severity of the misconduct required to be shown, and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors. Where the claimant is a non-insider, egregious conduct must be proven with particularity. It is insufficient for the objectant in such cases merely to establish sharp dealing; rather he must prove that the claimant is guilty of gross misconduct tantamount to 'fraud, overreaching or spoliation to the detriment of others.' Where the claimant is an insider, his dealing with the debtor will be subjected to more exacting scrutiny.

*In re Baker & Getty*, 974 F.2d at 718 (citation omitted). "Overreaching" has been defined as "that which results from an inequality of bargaining power or other circumstances in which there is an absence of meaningful choice on the part of one of the parties." *Black's Law Dictionary 1104 (6th ed. 1990).*

In the present case, there is no evidence on the record to indicate overreaching, misconduct, fraud, or any other inequitable conduct by Defendants to the detriment of other creditors. The fact that Defendants were prescient enough to redeem their stock while the Debtor was solvent is not grounds for equitable subordination. The law does

not punish shareholders who sell their stock at a time when the corporation has the financial wherewithal to redeem it.

Equitable subordination is not warranted on the facts of this case, and Count III of the Complaint is dismissed.

D.  Count IV: Disallowance of Defendants' Claims Pursuant to 11 U.S.C. § 502(d)

Section 502(d) of the Bankruptcy Code provides that unless an entity or transferee receiving a transfer avoidable under § 544 or liable under § 542 ("Turnover of Property to the Estate") has paid the amount for which such entity or transferee is liable under § 550 ("Liability of Transferee of Avoided Transfer"), any claim of such entity or transferee shall be disallowed.  Because Defendants did not receive voidable transfers in this case, Count IV of the Complaint is dismissed.

V.  Conclusion

For the reasons set forth in this opinion, Plaintiff's Motion for Summary Judgment is DENIED and Defendants' Motions for Summary Judgment are GRANTED.

Signed on January 31, 2008

                                    /s/ Marci B. McIvor
                              Marci B. McIvor
                              United States Bankruptcy Judge

27